BROWN et al. v. WILMORE COAL CO.

(Circuit Court of Appeals, Third Circuit. April 22, 1907.)

No. 14.

MINES AND MINERALS—GRANT OF MINING RIGHTS—FORFEITURE BY ABANDONMENT.

Defendant, for a nominal consideration expressed therein, obtained a large number of contracts, denominated "leases," from owners of land, conveying to him the coal and other minerals under such land, with the right to mine the same for 99 years and of renewal in perpetuity. By the terms of the contracts he was to render an account to the grantors and pay royalty at specified rates whenever any coal or other mineral was mined. *Held*, that such contracts imposed obligations upon defendant, as well as vesting him with rights, a mining enterprise being clearly contemplated thereby, and that where he did not in fact intend to prosecute such enterprise, and took no steps toward it, and paid no royalties, through a period of more than 20 years, during which coal was extensively mined in the vicinity, his rights were lost by abandonment, without regard to his actual intent to retain the same, and an owner in possession under subsequent conveyances from the same grantors was entitled to maintain a suit in equity to cancel the contracts as clouds upon its title.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Mines and Minerals, §§ 189, 190.]

Appeal from the Circuit Court of the United States for the Western District of Pennsylvania.

For opinion below, see 147 Fed. 931.

H. Snowden Marshall, for appellants.

D. L. Krebs and John G. Johnson, for appellee.

Before DALLAS, GRAY, and BUFFINGTON, Circuit Judges.

DALLAS, Circuit Judge. The Wilmore Coal Company exhibited its bill for relief from a cloud upon title against J. Willcox Brown and the New Amsterdam Coal Company in a court of common pleas of the state of Pennsylvania. The defendants having been duly served,

the suit, at their instance, was removed into the Circuit Court of the United States for the Western District of Pennsylvania, where, after hearing upon pleadings and proofs, a decree was entered in favor of the complainant, and the defendants appealed.

The general facts have been clearly set forth by the learned judge of the court below (147 Fed. 931), and we adopt his statement of them, as follows:

"In the years 1878 and 1880 the defendant J. Willcox Brown, a resident of Baltimore, Md., secured a large number of mining leases, aggregating about 16,000 acres, in different tracts, of various sizes, in Somerset county, Pa., as well as a like number in adjoining counties of Indiana and Cambria, 19 of which, of the Somerset lot, covering some 2,400 acres, are involved in the present suit. These leases were indentures under seal, and severally undertook, for the consideration in some cases of $5, and in some cases of $10, to grant, bargain, and sell to the said J. Willcox Brown, his heirs, executors, administrators, and assigns, 'all the iron ore, coal, cement, and fire clay, and all other minerals of every kind,' under the different tracts described, 'including the privilege of boring any number of wells and taking therefrom, by such means as are or may be most practicable, petroleum, carbon, or coal oil; also any salt water that may be found on the premises and manufacturing the same into salt,' together with the full and exclusive right, liberty, and privilege of mining, taking, and carrying away the said iron ore and other minerals, and of using such stones, earth, and water as might be necessary or required for conducting the mining operations. A few acres were reserved around buildings, and enough coal for the grantor's own use, and in some cases such as he might sell to his neighbors. The leases were to run for 99 years; the grantors covenanting at the end of that time to execute other leases of like tenor, for a similar term, renewable forever. In consideration whereof, it was agreed by the grantee that on the expiration of every three months, whenever any ore or other minerals were mined, quarried, or otherwise reduced to possession and removed from the premises, he would render to the grantor, his heirs, executors, and assigns, a true and correct account thereof; for every ton of coal, cement, fire clay, or other minerals than iron, five cents; and for every 100 barrels of petroleum or coal oil, and every 100 bushels of salt, 5 per cent. of the net profits. The leases were duly acknowledged and put on record in the office for recording of deeds in Somerset county, Pa., in July, 1880. A copy of one, as a type of all, although they differ in some minor particulars, is reproduced in the margin.[1]

"The section where these leases were located was entirely undeveloped at that time, except for farming, and was discredited as coal or mineral territory by the state geological survey. There was no railroad into it, and in view of this it was provided, in somewhat varying terms, in all but four of the leases here in controversy, that unless one was built within five years they should be null and void. As to those where no such provision appears it is charged in the bill that there was a verbal undertaking to the same effect by the defendant's agent at the time of securing them. But this is denied in the answer, and the evidence to sustain it is unsatisfactory, and they must therefore be taken as they stand. A railroad being a recognized necessity, however, the defendant Brown, in addition to his leases, busied himself with getting rights of way, some 64 of which he secured, 7 of these being from parties whose leases are involved in this suit. The railroad which he had in contemplation was to start at Johnstown, Pa., on the main line of the Pennsylvania Railroad, and run up Stony creek, and Paint or Shade creek, to the old Rockingham furnace at the head of the latter, and thence southeasterly, by other waters, in the direction of Hagerstown, Md.; and it was in general conformity with this that the rights of way were taken. No such railroad, however, was ever built. But in 1880 the Baltimore & Ohio Railroad constructed a branch from their line at Rockwood, Pa., northerly about 40 miles, through the center of Somerset county, to Johnstown, which followed down Stony creek

---

[1] See note at end of case.

a part of the way, by the mouth of Shade and Paint; and when it was being laid out the defendant Brown put his rights of way at the service of the Baltimore & Ohio engineers, although none of them were made use of. The building of this road, however, did not lead to the mineral development of that section, which came about a number of years later in quite another way. In 1892 to 1894 Robert H. Sayre and others began taking up coal lands in this territory, getting together about 18,000 acres, including much of that which is now in controversy, which they subsequently conveyed to the Wilmore Coal Company, which they had organized; and a year or two afterwards they sold out their interests in the company to Mr. Edward J. Berwind, president of the Berwind-White Coal Mining Company, who thereby secured their holdings, which he increased later to some 35,000 or 40,000 acres. Both Mr. Sayre and his associates, and Mr. Berwind after him, bought outright, at so much an acre. the coal which they purchased; that already leased to the defendant Brown being conveyed to them in fee by the original lessors or those who had succeeded to the title, in most instances without regard to the leases, but in some cases subject to them, the rights of the lessors being assigned, and in all with actual knowledge of them. Having got together this extended acreage, Mr. Berwind, endeavored to induce the Pennsylvania Railroad to run in a branch, but they declined to do so; and he was compelled to undertake it individually, which he did at an expense of about $500,000. This and the development of the different properties for mining, which followed, involving about $1,000,000 more, extended over two or three years, and not until some time in 1897, therefore, was any mining done; but since that time it has been actively pursued, and an extensive business built up, the operations being conducted by the Berwind-White Coal Mining Company, under the Wilmore Coal Company, to whom a royalty of 10 cents a ton is paid.

"In securing the lease in suit and others in that region, Mr. Brown did not expect to do any mining personally, and he has not, either by himself or others, nor has he paid royalties at any time on any of them; his purpose being to sell the leases to others or to transfer them to some company in which he had an interest, which would operate them. He sold some of his holdings in the southern part of the county in this way, and he made several attempts to interest parties in the others, including the New York Central Railroad people, and the Baltimore & Ohio. Learning of Mr. Berwind's purchases, he finally offered them to him, but without success; these negotiations ending in the spring of 1895, after which no others were undertaken. In 1892 certain of the leases were assessed and sold for taxes, but were redeemed by Mr. Brown, who paid some $1,500 to do so. They were sold again in 1896, but this he resisted, and succeeded in having the sale set aside by the court. Learning in 1902 that the Berwind-White Company were mining on certain of the lands which he had leased, he sent an engineer to investigate the matter, receiving from him a detailed and extended report, which confirmed the information, upon which he took counsel, with the idea of legal action. Some delay was experienced, however, with regard to this, the one-quarter interest, which he had assigned to the agent who secured the leases, being outstanding in the hands of various parties. But these having been got into line, a corporation was organized—the New Amsterdam Coal Company, defendant—to which all interests were transferred in exchange for stock; and in 1904 actions were brought by that company against the Berwind-White Coal Mining Company in the United States Circuit Court for the Southern District of New York for damages for taking the coal from six of the different tracts in controversy, following which, in May, 1904, the present bill was filed."

The conclusion reached by the learned judge was that the leases held by the defendants were invalid, and that, as they constituted a serious cloud upon the title of the plaintiff company, it was entitled to a decree requiring that they "be delivered up and canceled, and a minute of it made in the office where they are on record, limited always, however, to the coal, and not the other minerals, as to which

153 F.—10

alone an issue has been made." Omitting details, and eliminating the declaratory portions of the decree, it appears that its remedial part conforms precisely to the conclusion above referred to. That part may be restated thus:

"* * * Each and all of the said 18 leases or agreements hereinbefore described be, and the same hereby are, canceled, so far as the same purport in any way to affect the coal upon the said premises, or the right to enter the said premises and mine the coal upon the said premises, or in any other way affect the title to the coal upon the said premises; and * * * that upon delivery of a copy of this decree, duly certified by the Clerk of the United States Circuit Court, Western District of Pennsylvania, to the recorder of deeds of said county of Somerset, he, upon payment of the proper fees, enter the same or a minute thereof upon the margin of the record of each of said agreements or leases, and that thereafter it be filed among the records of his office."

Of the existence of the jurisdiction which was invoked, and of the propriety of its exercise under the circumstances stated by the court, there can be no doubt; and therefore the correctness of the decree must depend solely upon the answer which should be made to the question: Did the instruments of writing held by the defendants below vest in them a valid and paramount title to the coal in question, as against the plaintiff in possession under title through later conveyances? In deciding this question we need not discuss all of the many points and authorities to which counsel have invited our attention, for, as we view it, it may be briefly determined by simply applying the plain terms of the instruments themselves to the conclusively established facts.

Let it be conceded, as the court below held, that "the so-called leases to the defendant Brown constituted a sale and conveyance of the coal * * * in place." Yet it does not follow that he was entitled to have it remain in place indefinitely, notwithstanding his undertaking to pay for it from time to time, "as mined * * * or otherwise reduced to possession." The fact is that he never mined at all, nor made any payment whatever under his agreement to pay "for every ton of coal" "removed and taken from the premises." He could not abandon the possession, for he never had it, and his grantors could not have re-entered without first withdrawing, and this it was not incumbent upon them to do under any possible view of the provisions respecting mining and railroad construction. "* * * The party would not be required to turn out and re-enter. The law does not require the performance of vain things." Clark v. Trindle et al., 52 Pa. 492–496; Hamilton v. Elliott, 5 Serg. & R. 375; Innis v. Templeton, 95 Pa. 262, 40 Am. Rep. 643.

This case differs materially from that of Plummer v. Hillside Co., 160 Pa. 483–494, 28 Atl. 853, where "the consideration of the grant was not the development of the mineral value of the land, but the price fixed by the agreement and actually paid to the lessor in money." Brown, by the very nature of his contract, was bound by obligations to be fulfilled, as well as clothed with rights to be exercised; and "while the question [of abandonment] is one of intention mainly, its decision does not depend upon an intention to abandon or retain the

mineral right alone, divorced from the obligations which adhere to it under the contract, but the intention to abandon the contemplated enterprise." Paine v. Griffiths, 86 Fed. 455, 30 C. C. A. 182; Elk Fork Co. v. Jennings (C. C.) 84 Fed. 839. That the parties to these instruments contemplated the prosecution of an enterprise, and not an absolute sale of coal in place, their whole tenor makes perfectly plain; and that the lessee did not really intend to carry on that enterprise the proofs abundantly show.

The decree of the Circuit Court is affirmed.

### NOTE.

"This indenture, made this 3d day of January, one thousand eight hundred and seventy-nine, by and between Abraham Weaver, of the county of Somerset and state of Pennsylvania, of the first part, and J. Willcox Brown, of the city of Baltimore and state of Maryland, of the second and other part, witnesseth: That the said party of the first part, in consideration of the sum of five dollars, to them in hand paid by the said party of the second part (the receipt whereof is hereby acknowledged), have granted, bargained, sold, aliened, enfeoffed, and confirmed, and by these presents do grant, bargain, sell, alien, enfeoff, release, and confirm, unto the said party of the second part, his heirs, executors, administrators, and assigns, all the iron ore, coal, cement, and fire clay and all other minerals of every kind, including stone or earth as may be required for mining operations in, upon, and under all that certain tract of land situated in Paint township, county of Somerset, and state aforesaid, and containing one hundred and seventeen acres, more or less, and described as follows: Adjoining land with T. Hays, D. Shaffer, J. Nerenberger, and others—(all minerals are to be drifted) with the appurtenances thereto appertaining, together with the full and exclusive right, liberty, and privilege of mining, taking, and carrying away said iron ore and other materials, as heretofore more fully recited, with such control of, rights in, and privilege of using said land and water as may be necessary in conducting mining operations in a full and convenient manner. To have and to hold all the said iron ore and other materials, as is more fully recited heretofore, and all the rights and easements aforesaid in, upon, through, and under the said tract of land, and the hereditaments and premises hereby granted or mentioned, and intended so to be, unto the said party of the second part, his heirs, executors, administrators, and assigns, to and for his and their only proper use and behoof, for the period of ninety-nine years from the date hereof. The said party of the first part further covenants, for his heirs, executors, administrators, and assigns, that he will, upon the proper demand of the party of the second part, his heirs, executors, administrators, and assigns, and at the expiration of the term herein provided for, and upon tender by the said party of the second part, his heirs, executors, administrators, and assigns, of ——— dollars, execute another lease. If the railroad be not commenced within five years from this date, then this contract to be null and void.

"In further consideration whereof, the said party of the second part, his heirs, executors, administrators, and assigns, promises and agrees with the said party of the first part, his heirs, executors, administrators, and assigns, that he will, at the expiration of every three months, whenever any ore or other materials, as hereinbefore more particularly recited, is mined, quarried, or otherwise reduced to possession by the said party of the second part, his heirs, executors, administrators, and assigns, and removed from the premises, render to the said party of the first part, his heirs, executors, administrators, and assigns, a true and correct account of the materials removed and taken from the premises during the said preceding three months, and pay it to the said party of the first part, his heirs, executors, administrators, and assigns, as follows, that is to say: For every ton of iron ore of 2,240 pounds, ten cents. For every ton of coal of 2,240 pounds, five cents. For every ton of cement or fire clay of 2,240 pounds, five cents. For every ton of mineral ores, other than the above, of 2,240 pounds, five cents.

"In witness whereof, the parties hereto have set their hands and seals this 3d day of January, in the year one thousand eight·hundred and seventy-nine. 　　　　　　　　　　　　　　　　　　　Abraham Weaver. [Seal.]
　　　　　　　　　　　　　　　　　　"J. Wilcox Brown. [Seal.]

"State of Pennsylvania, Somerset County—ss.:

"Before me, a justice of the peace in and for the said county and state, personally came Abraham Weaver, the grantor, and acknowledged the foregoing instrument of writing to be his act and deed, and desired the same to be recorded as such, according to law.

"Witness my hand and seal, the 3d day of January, A. D. 1879.

　　　　　　　　　"Stephen H. Griffith, Justice of the Peace. [Seal.]"